# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

GEORGETTE HUTCHISON

        Plaintiff,

vs.                               CASE NO: 2:08-cv-741-JES-SPC

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.
_____

## REPORT AND RECOMMENDATION[1]

This matter comes before the Court on Plaintiff, Georgette Hutchison's, Complaint Seeking Review of the Final Decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's Claim for Disability Insurance (Doc. # 1) filed on October 1, 2008, in the Middle District of Florida, Fort Myers Division. Plaintiff filed her Memorandum of Law in Support of the Complaint (Doc. #15) on April 8, 2009. The Commissioner filed the Memorandum of Law in Support of the Commissioner's Decision (Doc. #16) on April 24, 2009. Thus, the Motion is now ripe for review.

The Undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings and memoranda submitted by the parties in this case.

## FACTS

---

[1]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

*Procedural History*

Plaintiff filed applications for disability and disability insurance benefits on December 8, 2004. (Tr. 15, 41, 42). The claims were denied initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge (ALJ). The hearing was held before ALJ Dawn Lieb. (Tr. 43-45, 49-51, 272-298). The ALJ issued an unfavorable decision on August 31, 2007. Plaintiff requested review of the ALJ's hearing decision with the Appeal Council. (Tr. 4-6, 9). Therefore, the decision of the Commissioner became final. Having exhausted all administrative remedies, Plaintiff timely filed a Complaint with this Court.

*Plaintiff's History*

Plaintiff was born on October 19, 1955. (Tr. 277). She was nearly 49 years old, "a younger individual" when she filed an application for benefits, and was nearly 52 years old when the ALJ rendered her decision in this case. Plaintiff earned a Bachelor's Degree in business and worked for Sprint as an operator and then administrative assistant from 1979 to 1999, and worked for Lee County Electric Company as a software support analyst from 1999 to 2003. (Tr. 94, 279, 286, 287). Plaintiff met the insured status requirements through December 31, 2008. (Tr. 17). Plaintiff alleges she became disabled as a result of rheumatoid arthritis, fatigue, depression, and difficulty handling stress. (Pl. Brief, Doc. #15, p. 1-2).

*Medical and Psychological History*

The earliest medical evidence contained in the Exhibit file consists of medical records from Richard DeIorio, M.D., dated August and September 2002, and medical records from Edward Humbert, D.O., dated November and December 2002. (Tr. 97-101, ISS). Both Dr. DeIorio's and Dr. Humbert's records indicate Plaintiff was referred by her treating physician, Charles C. Uliis, M.D.,

for evaluation of her bilateral upper extremity pain, left greater than right. (Tr. 99, 155). After examination, including a positive Phalen's test, Dr. DeIorio felt that Plaintiff most likely suffered from bilateral carpal tunnel syndrome, but "her presentation is not classic and her physical findings are soft." (Tr. 155). In September 2002, Dr. DeIorio interpreted results of nerve conduction studies as "normal" but Plaintiff still presented with a positive Phalen's test. Id.

In November 2002, Plaintiff complained to Dr. Humbert that her "hand is aching in the morning more than during the day," and that her pain radiated "up into her elbow and arm at times." (Tr. 99). Examination and test results showed "a mild Phalen's compression test for CT with the left greater than the right;" C-spine arthritis, "mild to moderate at C6-7 and C8-9 with potential area for compression of nerve roots," and "a mild type I acromion" in the left shoulder. *ld.* His diagnosis was 'potential cervical stenosis with DJD of the spine." Id. In December 2002, he noted her "small dorsal disc herniation at C6-7" and "smaller disc protrusions at C7 and T1, C5-6," and recorded that her symptoms had stayed the same, with "pain down into her arms and hands," and that she reported "coordination in her hands are (sic) worsening over time." (Tr. 97).

Dr. Humbert then referred Plaintiff to Allen Tafel, M.D., for further evaluation and administering of EMG/NCS studies, which occurred in December 2002. (Tr. 98, 100, 101). Dr. Tafel interpreted the test results as showing a mild left carpal tunnel syndrome, but he also noted Plaintiff's diagnoses of depression and anxiety disorder, Epstein Barr Virus, and hypothyroidism, as well as "a small disc protrusion at C6-7." (Tr. 98). He injected Plaintiff's left extremity with Depo-Medrol.(Tr. 98).

Plaintiff's treatment with her primary-care physician, Charles Curtis, M.D., is documented in medical records dated from July 2004 through December 2006. (Tr. 137-149, 158-169, 244-267).

3

Although she obviously treated with Dr. Curtis at least as early as 2002, as noted above, Plaintiff's first treatment note included in the record evidence is dated July 27, 2004, when her medical history encompassed anxiety, arthralgias, breast mass, depression, malignant neoplasm of the face, fatigue, headache, and hypothyroidism. (Tr. 153). Her medications were listed at the time as Provigil, Triamcinolone Acetonide cream, Fioricet, Lexapro, Wellbutrin, and Synthroid. (Tr. 153, 154). Throughout the rest of Dr. Curtis' 2004 office records, Plaintiff's symptoms were recorded as fatigue, joint pain, depression, and headaches. (Tr. 141, 144, 149). The diagnoses consistently included anxiety; hypothyroidism; headache; fatigue; depression; and arthralgias, with a skin lesion noted in December 2004, and her medications continued to include Wellbutrin, Synthroid, Lexapro, Provigil, and Fioricet. (Tr. 141, 142, 144, 145, 147, 148, 150).

Results of tests ordered by Dr. Curtis in 2003 and 2004 document benign mammogram findings, non-malignant lesion in the lower back, various blood count abnormalities, and positive rheumatoid factor findings. (Tr. 158, 159, 163, 165, 166, 168, 169). During Plaintiff's three visits to Dr. Curtis in 2005, she reported symptoms of fatigue, nocturia, joint pain (hands and arms), headaches, depression, and insomnia. (Tr. 138, 247, 251). Dr. Curtis' prescribed medications and diagnoses remained essentially the same as in 2004. (Tr. 137, 139, 247, 248, 251, 253). Plaintiff saw Dr. Curtis in April, August, September, and December 2006, when she reported persistent fatigue, as well as anxiety, depression, lesions on her lower back, headaches, and increased stress. (Tr. 245, 254, 259, 262). In December 2006, Dr. Curtis listed Plaintiff's medications as still consisting of Lexapro, Welibutrin, Synthroid, Provigil, and Fioricet, as well as Xanax and Triamcinolone Acetonide cream. (Tr. 254).

In addition, Dr. Curtis referred Plaintiff to rheumatologist, David Baldinger, M.D., who

initially saw Plaintiff in August 2004, when he stated, "laboratories show a positive ANA," "she has fibromyalgia, chronic fatigue," and "She does have carpal tunnel symptomatology and stiffness and some discomfort into the wrists but also musculoskeletal pain overall." (Tr. 160). Dr. Baldinger's examination revealed dorsal wrist tenosynovitis, decreased extension, fullness of the PIP joints, and lower extremity edema. (Tr. 160). His impression was polyarthritis mostly involving the wrists, autoimmune derangement, and anemia. (Tr. 160). Dr. Baldinger ordered an MRI of Plaintiff's right wrist in September 2004, which showed a possible arthritic process over the base of the first metacarpal, a 5 mm cyst vs. volar erosion in the capitate, a tear of the ulnar aspect of the TFC, a possible partial tear of the scapholunate ligament, joint fluid in all compartments of the wrist, partial tear of the extensor carpi ulnaris tendon, and synovitis. (Tr. 109, 110).

In his September 27, 2004, Dr. Baldinger wrote "review of her autoimmune antibodies show positive ANA 1-320 nucleolar, positive rheumatoid factor, low titer, thrombocytosis mild and microcytic anemia." (Tr. 104). Physical examination showed mild fullness of the right wrist and mild fullness of several PIP joints, the left hand, second and third PIPs and the right hand, second PIP joint. (Tr. 104). Dr. Baldinger's impression was that Plaintiff has autoimmune derangement and that "she may have rheumatoid arthritis even though her x-rays are unremarkable." (Tr. 104). Thus, he started Plaintiff on Methotrexate, and noted she was "utilizing Ottolenghim," (Tr. 104).

In November 2004, Dr. Baldinger opined that Plaintiff "most likely" had rheumatoid disease with "mostly bilateral wrist effusion and tenosynovitis." (Tr. 102). He continued Plaintiff on Methotrexate. Id.

Plaintiff also received treatment for diagnoses of major depression, recurrent, and premenstrual depression disorder from John Prater, D.O., whose records are dated from January 2005

5

through February 2007. (Tr. 223, 224, 269-271). On January 12, 2005, Dr. Prater recorded that Plaintiff had "[s]ome residual symptoms," but "new coping strategies including cognitive restructuring and change in activity" were addressed. (Tr. 224). Dr. Prater also noted that Plaintiff had been diagnosed recently with arthritis and was found to have an element of fibromyalgia. (Tr. 224). Dr. Prater prescribed medications were Wellbutrin, Lexapro, one week premenstrually and Provigil for fatigue. (Tr. 224). In July of 2005, Dr. Prater recorded that Plaintiff was symptomatically better, "with some ADL limitations due to arthritis discomfort," and that "recent psychosocial stressors" were processed. (Tr. 223).

Dr. Prater noted in January 2006, that Plaintiff was doing well on her current medications, but was still affected by rheumatoid arthritis. Plaintiff's thyroid medication had been increased recently, and she only took Advil for her pain. (Tr. 271). At the next session, Plaintiff presented with a "somewhat subdued" mood and affect, and Dr. Prater indicated that Plaintiff did not have "limitation in adult daily living tasks psychologically, [but] some physical limitations due to arthritis." (Tr. 270). By that time, Dr. Prater had added Xanax to her prescribed medications. (Tr. 270). Medical notes from February 2007, reflect his continued treatment with no new findings or symptoms recorded. (Tr. 269).

Plaintiff requested a second opinion from rheumatologist, Frank Vasey, M.D., who saw her on June 13, 2005. (Tr. 178-183). Plaintiff reported morning stiffness and severe fatigue, and "that using her hands continuously on the computer was impossible." Plaintiff also complained of constant exhaustion." (Tr. 178). She also was noted to have some dryness of her eyes, pleuritic chest pain, and numbness in her hands. (Tr. 178). Dr. Vasey opined that Plaintiff had rheumatoid arthritis, based on positive ANA of 1 160, and agreed with Dr. Baldinger's suggested treatment with Methotrexate.

6

(Tr. 178, 179).

## *Consultative Evaluations*

At the request of the State agency, Plaintiff underwent consultative evaluations with Patrick Ijewere, M.D., on March 22, 2005, Paul Miske, Ph.D., on March 3 and July 21, 2005, and with Martha Pollock, M.D., on August 12, 2005. (Tr. 115, 122, 184-189, 204-210). Summaries of these reports are as follows:

### *Dr. Patrick Ijewere*

Plaintiff reported her symptoms to Dr. Ijewere, stating, "I have no coordination in my hands to lift things and my wrists are very weak," that she cannot hold a gallon of milk except with both hands, that she drops things if not held with both arms, and that she awakens at night with hand numbness. (Tr. 115). Upon examination, Dr. Ijewere found visual acuity, with contacts, was "OD 20/10, Os 20/15, and OU 20/15," moderate PIP tenderness, swelling, and warm, severe Mep tenderness, swelling, and warm, moderate bilateral wrist tenderness, mild difficulty getting in and out of armless chair and exam table, reduced grip strength of 3/5 in both hands, moderate dexterity in both hands, and motor deficit of 4/5 in both upper extremities. (Tr. 117, 118). Dr. Ijewere opined Plaintiff has rheumatoid arthritis with significant limitation of grip and dexterity. There was acute inflammation of PIP and ICP. There was no limitation of spine or lower extremities. Overall challenge to hand function with or without resolution of acute inflammation. (Tr. 118).

### *Dr. Paul Miske*

On March 3, 2005, Plaintiff responded to Dr. Miske that she had been receiving treatment for clinical depression for about 10 years and was not currently experiencing any depressive symptoms, except that she did admit to being socially isolated. (Tr. 187, 188). Based on the brief interview, Dr.

7

Miske diagnosed "Major Depressive Disorder, Recurrent (in partial remission)." (Tr. 188). Dr. Miske's second report to the State agency, dated July 21, 2005, is essentially the same as the first. (Tr. 184-186).

### *Dr. Martha Pollock*

Plaintiff's primary complaints to Dr. Pollock were, "rheumatoid arthritis, fatigue, depression," which she described as affecting "multiple joints involving her arms and hands." (Tr. 204). She reported that "she is able to do housework but very slowly;" that she cannot sit, stand or walk for more than 20 to 30 minutes at a time due to stiff joints; she cannot lift more than 10 to 15 pounds; and that she can open a door but cannot pick up a coin or fasten small buttons. (Tr. 204). Dr. Pollock's examination was unremarkable except for visual acuity showing 20/70 in the right eye and 20/15 in the left eye, with contacts. (Tr. 205).

### *State Agency RFC Assessments*

State agency consultants reviewed the evidence available and completed physical RFC assessment forms and Psychiatric Review Technique forms ("PRTF"). (Tr. 123-138, 170-177, 190-203,211-218). On the April2005, RFC assessment form, a non-medical examiner indicated the Plaintiff could perform light work activity limited to occasional climbing, stooping, kneeling crouching, and crawling, no overhead reaching; frequent handling, and avoidance of exposure to wetness and hazards. (Tr. 170-177). On the RFC assessment dated August 2005, William Yahr, M.D., indicated Plaintiff could perform medium work activity with no climbing or crawling. (Tr. 211-218). On the PRTFs, both reviewing psychologists determined that Plaintiff had non-severe major depressive disorder that imposed no limitations whatsoever. (Tr. 123-138, 190-203).

### *Other Evidence*

8

The record evidence also contains a "Function Report" form completed by Plaintiff's father, George Sorentino, who explained that he visits his daughter 5 days a week and along with her husband and son, helps with household tasks. (Tr. 81-89). Mr. Sorentino reported that his daughter could prepare simple meals, and do light housework, but that she needed help with lifting, mopping, and pulling the vacuum. (Tr. 83). He also explained, "She can only lift light items - any movement causes her pain - she's always tired [and] can never finish what she's doing without a nap." (Tr. 83).

### *Administrative Law Judge's Decision*

After careful consideration of the entire record, the ALJ found Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2008. (Tr. 17). The ALJ found Plaintiff suffers from the following impairments: anxiety, hypothyroidism, headaches, fatigue, depression, arthralgias, rheumatoid arthritis, and carpal tunnel syndrome. (Tr. 17). However, Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR §404.1520(d), 404.1525 and 404. 1526. (Tr. 17). After careful consideration, the ALJ found Plaintiff had the RFC to perform sedentary work which includes the ability to stand/walk two hours out of an eight hour workday and sit six hours of an eight hour workday. Plaintiff is restricted to only occasional bending, twisting, balancing, stooping, kneeling, crouching, and crawling. (Tr. 18). Plaintiff is limited with respect to use of her hands for fine movements to only occasionally, but she can perform gross movement frequently. Plaintiff should avoid concentrated exposure to heat, wetness, humidity, vibration, cold temperatures, hazards, heights and moving machinery. (Tr. 18). The ALJ further stated, sedentary work, as defined by the regulations, involved lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. (Tr. 18). Although a sedentary job is defined as

9

one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. (Tr. 18). Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met [20 C.F.R. 404.1567, 416.967 (1994)]. (Tr. 18). The ALJ also found Plaintiff can understand, remember and carry out both simple and detailed instructions. (Tr. 18). Additionally, the ALJ found Plaintiff can work effectively with others and be cooperative and appropriate. (Tr. 18). However, the ALJ found Plaintiff is unable to return to any past relevant work. (Tr. 22). The ALJ noted Plaintiff was born on October 19, 1955, and was 47 years old, which is defined as a younger individual, on the alleged disability onset date. (Tr. 23). Plaintiff has at least a high school education and is able to communicate in English. (Tr. 23). The ALJ found transferability of job skills is material to the determination of disability in this case as Plaintiff is currently closely approaching advanced age. (Tr. 23). The vocational expert testified Plaintiff's transferable skills included knowledge of and operation of computer systems as well as familiarity with software systems. (Tr. 23). Therefore, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (20 C.F.R. 404.1560(c) and 404-1566). (Tr. 23). As a result, the ALJ found Plaintiff was not under a disability, as defined in the Social Security Act, from June 2, 2003, through the date of this decision. (20CFR 404.1520(g)). (Tr. 24).

## **THE STANDARD OF REVIEW**

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, and whether the findings are supported by substantial evidence. <u>Hibbard v. Commissioner</u>, WL 4365647 *2 (M.D. Fla. December 12, 2007) (citing<u>Richardson v. Perales</u>, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971); <u>McRoberts v. Bowen</u>, 841 F. 2d 1077, 1080

(11th Cir. 1988)). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[2]. 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Hibbard, WL 4365647 *2 (citing Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Phillips v. Barnhart, 357 F. 3d 1232, 1240 n. 8 (11th Cir. 2004). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67

---

[2]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
  *Step 1*. Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
  *Step 2*. Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
  *Step 3*. Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.
  *Step 4*. Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.
  *Step 5*. Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Phillips, 357 F. 3d at 1240 n. 8; Dyer v. Barnhart, 357 F. 3d 1206, 1210 (11th Cir. 2005). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997). Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Williams v. Commissioner, 407 F. Supp. 2d 1297, 1299-1300 (M.D. Fla. 2005) (citing Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).

## **DISCUSSION**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

Plaintiff opposes the Commissioner's decision on three grounds: (1) the ALJ failed to provide reasons for rejecting the opinion of Dr. Ijewere; (2) the VE's conclusions are in conflict with the

Medical Vocational Guidelines (Grids); and (3) the ALJ failed to meet his burden at Step 5, that there are other jobs in the national economy Plaintiff can perform because the hypothetical question was incomplete. The Commissioner responds that the final decision denying Plaintiff's claim was supported by substantial evidence in the record.

### *(1) Whether the ALJ Failed to Provide Reasons for Rejecting the Opinion of Dr. Ijewere*

Plaintiff argues the ALJ failed to specify the weight she applied to the opinion of Dr. Patrick A. Ijewere, M.D., a consultive physician. Dr. Ijewere opined Plaintiff had "interphalangeal tenderness, severe metacarpal phalangeal (MCP) tenderness, moderate shoulder tenderness, slightly diminished upper extremity motor deficits and tenderness, and decreased grip strength." Plaintiff argues Dr. Ijewere opined Plaintiff had reduced manipulative limitations and the ALJ failed to state how much weight he had given to Dr. Ijewere's opinion in her decision. Thus, Plaintiff states the ALJ violated Social Security Ruling (SSR) 96-08p. The Government argues that the ALJ included Dr. Ijewere's opinion in his discussion and noted in her RFC determination that Plaintiff had limited hand movements. (Tr. 18).

SSR 96-8p was issued by the Social Security Administration to "state the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits under titles II and XVI of the Social Security Act." SSR 96-8p.

The determination of RFC is within the authority of the ALJ and along with the claimant's age, education, and work experience the RFC is considered in determining whether the claimant can work. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)). The RFC assessment is based upon all the relevant evidence of a claimant's remaining ability to do

work despite her impairments. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); Lewis, 125 F.3d at 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. Phillips, 357 F.3d at 1238. That is, the ALJ must determine if the claimant is limited to a particular work level. Id. (citing 20 C.F.R. § 404.1567).

In her decision the ALJ noted as follows:

> Patrick Ijewere, M.D., examined the claimant on March 22, 2005, for rheumatoid arthritis, hand fatigue and discomfort in the claimant's arms, shoulders and back. A physical examination revealed moderate interphalangeal tenderness, severe metacarpal phalangel (MCP) tenderness, moderate shoulder tenderness, slightly diminished upper extremity motor deficits and decreased grip strength. Dr Ijewere observed that the claimant exhibited moderate dexterity, full lower extremity motor function, intact sensation and negative straight leg raises with no evidence of spinal tenderness, hip/knee/ankle signs or atrophy. Dr. Ijewere diagnosed the claimant with rheumatoid arthritis along with significant grip and dexterity limitations. Dr. Ijewere noted that the claimant was able to walk fine.

(Tr. 20). The ALJ followed up her review of Dr. Ijewere's consultative examination and diagnosis by including the limitations diagnosed by Dr. Ijewere in her RFC. The ALJ stated. . . "[ Plaintiff] is limited with respect to use of her hands for fine movements to only occasionally but she can perform gross movement frequently. . . ." (Tr. 18).

The ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. Phillips, 357 F.3d at 1238. Contrary to Plaintiff's assertion, the ALJ did not reject the opinion of Dr. Ijewere, but considered Dr. Ijewere's opinion in making her RFC determination. Thus, the ALJ complied with the current case law and SSR- 96-08p by noting Dr. Ijewere's opinion and applying it to Plaintiff's RFC determination.

*(2) Whether the VE's Conclusions are in Conflict with the Medical Vocational Guidelines (Grids)*

Plaintiff argues that pursuant to Grid Rule 201.07, Plaintiff has no transferable skills and that under the Grids she should be presumed disabled after her fiftieth (50th) birthday. Plaintiff turned fifty (50) on October 19, 2005. The Plaintiff also states that pursuant to SSR 82-41, the ALJ was required to identify specific occupations to which Plaintiff's acquired work skills were transferable under the GRIDS.

Contrary to Plaintiff's assertions, the ALJ did specifically note that pursuant to SSR 82-41, Plaintiff had specific transferable skills. (Tr. 23). The Commissioner further argues the ALJ recognized that she could not make a determination based upon the GRIDS and brought in a VE to provide testimony that there were other jobs in the national economy Plaintiff could perform with her limited sedentary RFC.

Plaintiff contends that as an individual approaching advanced age, she should have been found disabled under the GRIDS, because as an individual approaching advanced age with a high school diploma and no transferable skills, she is considered disabled pursuant to GRID Rules 201.09, and 201.201. 20 C.F.R. § 404, Subpt. P. App. 2. As Plaintiff notes, a finding of disabled under the GRIDS is irrefutable. Thus, Plaintiff concludes the VE was in conflict with the GRIDS when he informed the ALJ Plaintiff could work at least two jobs in the local and national economy.

Specifically, the VE said Plaintiff could work as a food/beverage order clerk, and a surveillance system monitor. Both jobs are unskilled labor. Since the VE only noted unskilled jobs, Plaintiff argues she should have been found disabled because she is an individual with a high school diploma, with no transferable skills.

However, the VE found that Plaintiff's former knowledge and operation of computer systems

and software were transferable skills. (Tr. 23). The ALJ then made a finding that the skills noted by the VE were transferable. (Tr. 23). The Commissioner notes that Plaintiff is citing the improper GRID Rule using GRID Rules 202.09, and 201.201. However, in her decision, the ALJ applied GRID Rule 201.22 which lists the claimants past work as skilled or semi-skilled and directs a finding of not disabled if the claimant has transferable skills. C.F.R. § 404 Subpt. P, App. 2. GRID Rules 202.09 applies to an individual approaching advanced age whose whose past work was semiskilled or required no skill, with limited or no education with non-transferable skills. C.F.R. § 404 Subpt. P, App. 2.

At the time of her application, Plaintiff was a younger individual with more than a high school education and transferrable skills, and therefore, the GRIDS suggested by Plaintiff are not applicable to this case. Here, the ALJ, found Plaintiff's skills were transferable and supported that decision with substantial evidence, specifically the VE's testimony, therefore, the Court cannot make another determination. Since Plaintiff has transferable skills, Plaintiff's GRID Rules are not applicable. As Plaintiff herself acknowledges, an individual limited to sedentary work that has transferable skills is not considered disabled under the GRIDS. C.F.R. § 404 Subpt. P, App. 2. Thus, the VE's determination that Plaintiff could work jobs in the national economy did not conflict with the application of the GRIDS.

Plaintiff also argues that since the VE did not identify any jobs in the local or national economy that her skills were transferable too, the Court should determine that Plaintiff had no transferable skills. Plaintiff's argument is not well taken. The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]." Phillips, 357 F. 3d at 1240 n. 8; Dyer, 357 F. 3d at 1210. Since the ALJ found Plaintiff had transferable skills the Court

16

may not reassess her decision and find that Plaintiff does not have transferrable skills.

        *(3)    Whether the ALJ's Hypothetical Question Posed to the VE was Incomplete*

When using a VE, the ALJ must pose hypothetical questions to the VE to determine whether someone with the same limitations as the claimant will be able to secure employment in the national economy. Humphries v. Barnhart, 183 Fed. Appx. 887, 891 (11th Cir. 2006) (citing Phillips v. Barnhart, 357 F. 3d 1232, 1239 (11th Cir. 2004). That hypothetical question must include "all of the claimant's impairments." Humphries, 183 Fed. Appx. at 891 (citing Wilson v Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002)); Jones v. Apfel, 190 F. 3d 1224, 1229 (11th Cir. 1999) *cert. denied*, 529 U.S., 120 S. Ct. 1723, 146 L. Ed. 2d 664 (2000).

Hypothetical questions asked by the ALJ to the vocational expert must describe comprehensively the claimant's impairments. Loveless vs. Massanari, 136 F.Supp.2d 1245, 1250 (M.D. Ala. 2001) (citing Pendley v. Heckler, 767 F.2d 1561, 1652 (11th Cir. 1985) (*per curiam*)). If the hypothetical question upon which the vocational expert bases his evaluation does not assume all of a claimant's impairments, the decision of the ALJ denying a claimant's applications for disability insurance benefits, which is based significantly on the expert testimony, is not supported by substantial evidence. Loveless, 136 F.Supp.2d at 1250. Notwithstanding, the foregoing general standard, the hypothetical question posed by the ALJ may omit non-severe impairments. Id.

Plaintiff states the hypothetical question posed to the VE in this case was incomplete because the ALJ did not include Dr. Ijewere's opinion that Plaintiff has gripping limitations, and secondly, the ALJ failed to include Plaintiff's moderate limitations in maintaining persistence and pace and depression. The Commissioner responds that the ALJ's hypothetical question fairly set out all of Plaintiff's reasonable limitations.

After reviewing Plaintiff's medical records, education, and past relevant work the ALJ asked the VE the following hypothetical:

> [L]et's look at someone who has a limited range of light. Occasionally lift and carry 20, frequently 10. Sit six, stand two. So someone who needs to be able to change position, say three times an hour. Up to three times a hour. Just to stretch and then go back to– we have someone whose limited use of upper extreme– not the upper extremities, but the hands occasional, fine. Okay. Was there someone who has occasional– can occasionally engage in postural activities? No visual limitations, no communicative limitations. This person should avoid concentrated exposure to environmental irritants, just called heat, wetness, humidity, especially vibrations. Hazards, heights, moving machinery. This is not someone who has–start with no mental limitations. They can remember locations and work-like procedures, carrying out short, simple instructions as well as multistep instructions. This is some who can work with others, be cooperative and work with the public asa well as supervisors. Could a hypothetical person return to the past relevant work of this claimant?

(Tr. 291). The VE stated the limited use of the hands would prevent the Claimant from returning to her past relevant work. (Tr. 292). Upon that response, the ALJ asked the VE if the lifting was changed to reflect an individual who could only lift ten (10) pounds occasionally and less than ten (10) frequently. (Tr. 292). The VE responded with several jobs in the national and local economy Plaintiff could perform.

Regarding Plaintiff's first argument, the ALJ did not exclude Dr. Ijewere's opinion but included it in her hypothetical noting Plaintiff had upper body limitations with her hands and fine manipulation abilities. (Tr. 292). Thus, the ALJ did not overlook Dr Ijewere's opinion in her hypothetical to the VE.

Plaintiff also states that the ALJ did not include Plaintiff's moderate limitations in maintaining persistence and pace and her depression in the hypothetical. In her decision, the ALJ noted that Dr. Paul Miske performed a psycho-diagnostic evaluation on Plaintiff on March 3, 2005, and July 21,

2005. Dr. Miske perform a mental status examination on Plaintiff. The mental status examination revealed had "logical/coherent thought processes and a normal attention span, full sphere orientation, good insight and intact judgment. (Tr. 20). The ALJ also considered the medical evidence from Dr. John Prater, D.O. who treated the Plaintiff on January 12, 2005, and July 21, 2005. Dr. Prater observed that Plaintiff had a stable mood/affect in addition to unimpaired insight and judgment. (Tr. 20). Dr. Prater saw Plaintiff on July 6, 2006, when the claimant's mood and affect were describe as somewhat subdued but she was described as oriented, without gross intellectual impairment and no receptive or express problems and no evidence of psychotic symptoms. The ALJ also noted that there were some notes dated February 28, 2007, which reflected that Plaintiff was not demonstrating any cognitive loss but has "positive insight." (Tr. 21). The ALJ continued that Dr. Prater opined that Plaintiff's prognosis was "quite good," and that Plaintiff was oriented without loss of judgment and without cognitive impairment. (Tr. 22).

The ALJ may omit non-severe impairments from the hypothetical question. Loveless, 136 F.Supp.2d at 1250. Here it is clear that the medical evidence demonstrates that Plaintiff had no cognitive impairment that would cause Plaintiff to have severe limitations in maintaining persistence and pace and depression. While Plaintiff was diagnosed with depression, Dr. Prater noted that her mood was usually positive and stable. Thus, the ALJ did not err by leaving Plaintiff's depression and moderate limitation in persistence and pace because she was not required to include a non-severe impairment in the hypothetical question to the VE.

## Conclusion

Based upon the Court's review of the Record and the Memoranda of Law by the Parties, the Court respectfully recommends the ALJ properly used the opinion of Dr. Ijewere in her decision

denying Plaintiff's claim; (2) the VE's conclusions were in compliance with the Medical Vocational Guidelines (Grids); and (3) the ALJ's hypothetical question to the VE was complete and contained all of Plaintiff's severe impairments. Thus, the Court respectfully recommends that Plaintiff's Motion to Remand should be denied and the decision of the Commissioner should be affirmed.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Decision of the Commissioner should be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** at Fort Myers, Florida, this 26th day of October, 2009.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:
Counsel of record, MJCD